GREENAWAY, JR., Circuit Judge,
dissenting.
The tension between the branches of our government reflects the brilliance and prescience of our Founding Fathers and is the foundation of our nation’s democracy. Who may exercise power, and under what circumstances, is often dependent on our branches’ interpretation of the wording and meaning of the Constitution. In this matter, the Recess Appointments Clause of Article II is at issue. My colleagues in the Majority have determined that the recess appointment of Member Craig Becker on March 27, 2010 is invalid and, for the same reasons, would presumably find that *245 the recess appointments of Members Sharon Block, Terence Flynn, and Robert Griffin on January 4, 2012 are likewise invalid. The Majority’s rationale undoes an appointments process that has successfully operated within our separation of powers regime for over 220 years.
In defining the scope of the Recess Appointments Clause, the critical issue is more straightforward than the Majority suggests: The issue is whether “the Recess” includes only intersession recesses (those between two regular sessions of Congress) or intersession recesses and in-trasession recesses (those within a regular session of Congress).[1] The Majority’s three possible definitions of “Recess” can be distilled into one question: Are intra-session recesses included within the ambit of “the Recess”? I would hold that “the Recess” refers to both intrasession and intersession' recesses because the Senate can be unavailable to provide advice and consent during both. The availability of the Senate to provide advice and consent is the crux of the Recess Appointments Clause because its operation depends on its complementary interplay with the Appointments Clause, which requires that the Senate be available to provide advice and consent.
The plain meaning and structure of the text of the Constitution, the intent of the Framers, the purpose of the Recess Appointments Clause, and the tradition and practice of the branches of our government all demand this result. Any interpretation of the Recess Appointments Clause is incomplete without consideration of the executive power and the system of separation of powers devised by the Framers, and such consideration leads to the pragmatic conclusion that the President must be able to make recess appointments during intrasession recesses. Since the March 27, 2010 recess appointment of Member Becker and the January 4, 2012 recess appointments of Members Block, Flynn, and Griffin were all made during intrasession recesses, I would hold that each appointment was a valid exercise of the executive power granted to the President in the Recess Appointments Clause of Article II of the Constitution.[2] I respectfully dissent.[3]
I. “The Recess”
A. The Text of the Constitution
Our examination of the Recess Appointments Clause is dependent on the interpretation of two words: “the Recess”. This examination then begs two inquiries: 1) the meaning of “Recess” within the Recess Appointments Clause and 2) the significance of “the”, a definite article, as a modifier. Recesses fall into two general categories, intersession and intrasession, and so unraveling the meaning of “Recess” begins and ends with resolving the intersession-intrasession dynamic. The Majority posits that this dichotomy contemplates that intersession breaks and intrasession breaks are both recesses by the Senate *246 that have contrasting effects on the President’s ability to make recess appointments. I disagree.
As a starting point in defining a “recess”, it is helpful to define a “session” since the two terms are related. There are various types of sessions, including the “daily sessions” of Congress, during which it conducts its day-to-day business, as well as its “regular sessions”, which are the periods during which Congress conducts its business on a regular basis. In addition to these sessions, there are also “extraordinary sessions” of Congress that can be called by the President under Article II.[4] U.S. Const, art. II, § 3. And, since the House and Senate are not required to match schedules, the session or recess of one body may be different than that of the other.
Based on the definition of a regular session, recesses can be divided into the two mentioned categories of breaks, intersession recesses and intrasession recesses. Intersession recesses are those breaks of the Senate that occur between two regular sessions of the Senate; they are generally initiated by an adjournment sine die. See Henry B. Hogue, Cong. Research Serv., Recess Appointments: Frequently Asked Questions 1-2 (Jan. 9, 2012). Intrasession recesses are breaks that occur during a regular session of the Senate. It had been suggested that Congress cannot be in a recess and in a regular session concurrently, but the Supreme Court has rejected this conclusion. Wright v. United States, 302 U.S. 583, 589, 58 S.Ct. 395, 82 L.Ed. 439 (1938) (“Plainly the taking of such a recess [by one house] is not an adjournment by the Congress. The ‘Session of Congress’ continues.”); see also Evans v. Stephens, 387 F.3d 1220, 1225 (11th Cir.2004) (en banc). From this, it is possible for one house to recess while the session of the Congress, as a joint body, continues.[5]
To begin our textual analysis, the Recess Appointments Clause must be read in conjunction with the Appointments Clause. While the Majority also reads these two clauses together, it takes a shortsighted view of their interrelation. The Majority contends that the Appointments Clause gives the President a “perpetual” power to seek the advice and consent of the Senate. (Majority Op. at 58-59.) The Majority also contends that the Appointments Clause suggests a preference for “divided power” in the appointments process. I could not agree more with the Majority that every facet of the appointments process must reinforce the separation of powers, but the Majority’s view is too narrow. While the Recess Appointments Clause gives the President sole authority to make appointments during the “Recess” of the Senate, the Recess Appointments Clause maintains the separation of powers within the larger framework of the appointments process. In The Federalist No. 67, which the Majority relies upon for this point, Alexander Hamilton emphasized that the *247 recess appointment power was only a supplement to the advice and consent power of the Senate. The Federalist No. 67, at 409 (Alexander Hamilton) (Clinton Rossi-ter ed., 1961). The Majority misinterprets Hamilton’s point. The supplemental nature of the Recess Appointments Clause helps to maintain the separation of powers by preventing the President from holding the entire power to appoint in his hands.
The Appointments Clause provides that a nominee may only be presented by the President but, on the other hand, may only be confirmed to office with the advice and consent of the Senate. The Recess Appointments Clause thereafter provides an alternate means of confirming nominees when the Appointments Clause cannot be implemented, namely when the Senate cannot provide advice and consent to the President. After all, the Appointments Clause and Recess Appointments Clause cannot both operate simultaneously — one means of appointment must be used or the other. Thus, it can be adduced that the meaning of “the Recess” is the converse of when the Senate can provide advice and consent to the Senate: The Senate is in “the Recess” when it is not available to provide advice and consent. See Noel Canning v. NLRB, 705 F.3d 490, 505 (D.C.Cir.2013) (observing that there is “a crucial element of the [Recess Appointments] Clause, which enables the President to fill vacancies only when the Senate is unable to provide advice and consent” (emphasis in original)). Since the Senate can be unavailable to provide advice and consent during either an intrasession recess or an intersession recess, “the Recess” naturally encompasses both types of recesses. To provide advice and consent, the Senate must be able to offer a confirmation vote on nominees, be it up or down.[6]
*248 While courts have not had occasion to articulate a standard for advice and consent, it is clear through the plain meaning of “advice and consent” that the provision of advice and consent cannot be perfunctory. It is only reasonable to require that there must be a deliberative process (“advice”), a vote (“consent”), and a quorum of Senators actually present in the Senate chamber. See Elizabeth Rybicki, Cong. Research Serv., Senate Consideration of Presidential Nominations: Committee and Floor Procedure 10 (July 1, 2003) (“A majority of Senators present and voting, a quorum being present, is required to approve a nomination.”). It is no secret that the advice and consent process is a long and arduous ordeal. See Noel Canning, 705 F.3d at 508 (calling the advice and consent process “cumbersome”). Various forms of “vote” are used frequently elsewhere in the Constitution, so the Framers would not have used “Advice and Consent” if they only intended for nominees to be confirmed by a vote.[7]
“Recess”, no doubt, is a malleable term because of the several types of breaks that the Senate takes. As far as a recess is considered a break of the Senate, all recesses can be classified generally as adjournments, in the sense that they are suspensions in the business of the Senate until a further date. Adjournments, though, come in different species. An adjournment sine die usually signifies the end of a regular session of Congress. See Henry B. Hogue, Cong. Research Serv., Recess Appointments: Frequently Asked Questions 1-2 (Jan. 9, 2012). An adjournment to a day and time certain will conclude the business of one legislative day until the next. Floyd M. Riddick & Alan S. Furman, Riddick’s Senate Procedure: Precedents and Practice, S. Doc. No. 101— 28, at 14 (1992) (hereinafter “Riddick’s Senate Procedure”). The Senate will also adjourn for lunch by recessing. See, e.g., 159 Cong. Rec. S1249 (daily ed. Mar. 7, 2013) (“Under the previous order, the Senate stands in recess until 2 p.m. Thereupon, the Senate, at 12:30 p.m., recessed until 2 p.m. and reassembled when called to order by the Presiding Officer....”).
It is telling that the Framers chose to use the term “Adjournment” several times elsewhere in the Constitution. Accordingly, there must be some reason why the Framers did not use “Adjournment” in the Recess Appointments Clause and did not use “Recess” where “Adjournment” appears. The apparent and plain explanation for this distinction in terminology is that, elsewhere in the Constitution, “Adjournment” refers to a certain species of breaks of Congress different from the species of breaks referred to by the “Recess” in the Recess Appointments Clause. See Noel Canning, 705 F.3d at 500 (determining that “the Framers intended something specific by the term ‘the Recess,’ and that it was something different than a generic break in proceedings”).
To illustrate, the scenarios embodied by the clauses that employ “Adjournment” could apply to adjournments between two daily sessions of Congress — perhaps the *249 adjournment that occurs during the weekends of a regular session of Congress— whereas “Recess” would not apply to such an adjournment if the Senate was still available to provide advice and consent. The Majority observes that the Supreme Court held that “Adjournment”, as used in the Pocket Veto Clause, could refer to any break in business. (Majority Op. at 223.) It is true that “Recess” encompasses a narrower subcategory of breaks than “Adjournment”. (Majority Op. at 233 (“So the dichotomy does reveal that recess must mean something narrower than any break that follows an adjournment.”).) But, unlike the Majority, I do not understand this distinction to be meaningless. (Majority Op. at 233 (“But what this narrower definition is cannot be derived from the dichotomy between adjournment and recess alone.”).)
As a narrower species of breaks than “Adjournment”, “Recess” cannot reasonably be read to include every type of adjournment, such as the breaks the Senate takes for lunch, for the night between daily sessions, and over the weekends. See 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787, at 409-10 (Jonathan Elliott ed., 2d ed.1836) (hereinafter “Elliott’s Debates”) (statement of James Madison at the Virginia convention) (“There will not be occasion for the continual residence of the senators at the seat of government.... It is observed that the President, when vacancies happen during the recess of the Senate, may fill them till it meets.”).
In the case of the Adjournments Clause, the adjournment contemplated there is also different than “the Recess” contemplated by the Recess Appointments Clause. To encompass “the Recess” within the adjournment contemplated by the Adjournments Clause would submit the President’s recess appointment power to the whims of the House because the House must provide its consent if the Senate is to adjourn for more than three days. This is a result clearly antithetical to the text of the Constitution and the intent of the Framers. As Hamilton admonished, the House was not to interfere with the appointments process because “[a] body so fluctuating and at the same time so numerous can never be deemed proper for the exercise of that power [of appointments]. Its unfitness will appear manifest to all when it is recollected that in half a century it may consist of three or four hundred persons.” The Federalist No. 77, at 463 (Alexander Hamilton) (Clinton Rossiter ed., 1961).
Our analysis must also be educated by the provident lesson of the Supreme Court in The Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), since the mechanism and construction of the Pocket Veto Clause closely parallels the Recess Appointments Clause in striking ways.[8] The Majority relies on The Pocket Veto Case in its analysis but misses the true import of that case’s analysis. (Majority Op. at 223, 231-32.) Both the Pocket Veto Clause and the Recess Appointments Clause provide a check on Congress when it is unavailable to perform one of its functions by placing a procedural limit on the exercise of its power. In that case, the Court considered whether the “ten Days” language of the Pocket Veto Clause included all days or just “legislative” days. The Court refused to read the modifier “legislative” into the Pocket Veto Clause, favor *250 ing a more expansive reading of the Clause. Id. at 679-80, 49 S.Ct. 463. The Court then faced a dichotomy similar to our intersession-intrasession divide: Whether the use of “Adjournment” in the Pocket Veto Clause only applied to final adjournments or also to interim adjournments. Id. at 680-81, 49 S.Ct. 463. The Court again rejected a constricted reading of the Clause and favored a broader executive power, holding that “adjournment” could apply to either type of adjournment because “[t]he power thus conferred upon the President cannot be narrowed or cut down by Congress, nor the time within which it is to be exercised lessened, directly or indirectly.” Id. at 677-78, 49 S.Ct. 463.
While the Majority focuses on why “the Recess” only refers to intersession recesses, there is a bald deficiency in these arguments. The Majority’s intersession limitation reads modifiers into the Recess Appointments Clause that are plainly not part of the text.[9] These modifiers rewrite the Constitution for the Framers. The imperative set in The Pocket Veto Case, where parties attempted to read similar modifiers into the Constitution, chides against limiting the recess appointment power by inserting a modifier like “intersession” before “Recess” and supports including multiple types of recesses within the meaning of “the Recess”. See 279 U.S. at 679, 49 S.Ct. 463 (“There is nothing whatever to justify changing this meaning by inserting the word ‘legislative’ as a qualifying adjective.”); id. at 680, 49 S.Ct. 463 (“The word ‘adjournment’ is not qualified by the word ‘final’; and there is nothing in the context which warrants the insertion of such a limitation.”).
The Recess Appointments Clause does not distinguish between intersession and intrasession recesses. See Evans, 387 F.3d at 1224-25. Accordingly, we should not read such a limitation onto the executive power where one has not been directly conferred by the Framers. Cf. Myers v. United States, 272 U.S. 52, 118, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (reasoning that the executive power is “limited by direct expressions where limitation was needed, and the fact that no express limit was placed on the power of removal by the executive was convincing indication that none was intended”). The Recess Appointments Clause sets forth no exceptions defining the type of recesses that may be excluded, whereas the Framers provided exceptions elsewhere in the Constitution. The only modifier of “Recess” is “the” and “the” certainly is not synonymous with “intersession”. Evans, 387 F.3d at 1224. Nor is “the” readily interpreted as “a single type of’, which would need to be the reading if “Recess” is only to refer singularly to intersession recesses. Even the Majority, unlike Noel Canning, concedes that “the” lacks the necessary specification to limit “Recess” to one type of recess.[10] *251 (Majority Op. at 227 (observing that “there is nothing in the word ‘the’ itself that necessarily requires ... intersession breaks”).)
Framed differently, if the text of the Recess Appointments Clause was meant to distinguish between intersession and intra-session recesses, the Framers would have employed some other modifier not as cryptic or pedestrian as “the”. If that had been their intent, the Framers were certainly deliberate enough to have inserted some modifier to indicate that “the Recess” only refers to the recess between regular sessions of Congress. See Wright, 302 U.S. at 588, 58 S.Ct. 395 (establishing that, as an essential tenet of constitutional interpretation, courts must respect “ ‘the high talent, the caution, and the foresight of the illustrious men who framed [the Constitution]’ ” such that “ ‘[e]very word appears to have been weighed with the utmost deliberation’ ” (quoting Holmes v. Jennison, 39 U.S. 540, 571, 14 Pet. 540, 10 L.Ed. 579 (1840))); United States v. Sprague, 282 U.S. 716, 732, 51 S.Ct. 220, 75 L.Ed. 640 (1931) (describing the Constitution as an “instrument drawn with such meticulous care and by men who so well understood how to make language fit their thought”).
Consequently, it is telling that, despite that possibility, they chose not to include such a modifier and chose one of the most bland modifiers in the English language. Also, congruent with the Framers’ use of “Adjournment” to refer to a broader category of breaks than “Recess”, it is plausible that “the” as a modifier serves to emphasize that “Recess” refers to a definite, circumscribed class of adjournments. As Hamilton assured, there is an “obvious meaning of the terms” in the Recess Appointments Clause. The Federalist No. 67, at 409 (Alexander Hamilton) (Clinton Rossiter ed., 1961).
This same point about reading modifiers into the Constitution applies with equal vigor to arguments that the length of “the Recess” should be limited to a certain number of days. In relation to the dura-tional limits of intrasession and intersession recesses, the use of express day limits elsewhere in the Constitution suggests that the Framers deliberately chose not to include such a modifier in the Recess Appointments Clause. In the Pocket Veto Clause, the Framers deliberately added a day limitation (rather than simply saying that a bill would not become law if it could not be returned to the house in which it originated). This shows that the Framers could have crafted a similar day limitation into the Recess Appointments Clause if they had so desired. In addition, there are no time constraints on the Appointments Clause itself. As the Majority points out, the Appointments Clause “lacks any limitation on when this power is operative” such that “the president always has the power to fill vacancies through nomination and the advice and consent of the Senate.” (Majority Op. at 228 (emphasis in original).) But, since the Recess Appointments Clause depends on when the Appointments Clause is not operative and similarly lacks any explicit limitation, there is no consistency in reading a hard time *252 limit into the Recess Appointments Clause without reading one into the Appointments Clause.
The other flaw in the Majority’s premise that “Recess” is restricted to intersession recesses is that it relies on a technical definition of “recess” rather than a plain and ordinary definition of “recess”. See The Pocket Veto Case, 279 U.S. at 679, 49 S.Ct. 463 (“The words used in the Constitution are to be taken in their natural and obvious sense....”); see also District of Columbia v. Heller, 554 U.S. 570, 576-77, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (“Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.”). As a document written for the people and meant to be accessible to every citizen, we must assume that the Framers intended for words to be understood by their ordinary, rather than their technical, definition. See Heller, 554 U.S. at 576-77, 128 S.Ct. 2783. The Majority admits that “Recess” “lacks a natural meaning that clearly identifies whether it includes only intersession breaks or also includes intrasession breaks.” (Majority Op. at 221.) The logical inference from the Majority’s assessment is that “Recess” lacks a natural limitation or natural specification. Thus, the only way to delimit “Recess” to intersession recesses would be to shroud it in an unnatural meaning, which would not lend an obvious or ordinary meaning to the word.[11]
The narrowing of the term “Recess” by the Majority belies the broad latitude of the plain meaning of the word used by the Framers. The Framers did not modify the term by describing it as “the intersession Recess” or “the Recess between Sessions” — they deliberately used a less qualified and, duly, broader term. To interpret the text otherwise also seems less plausible since it is far-fetched to suppose that the Framers expected for the Recess Appointments Clause to be interpreted through the textual hopscotch needed to arrive at the intersession interpretation. Such a patchy guesswork does not conjure the “obvious meaning” described by Hamilton.[12] The Federalist No. 67, at 409 (Al *253 exander Hamilton) (Clinton Rossiter ed., 1961).
The Majority attempts to thread together several divergent lines of reasoning for why “the Recess” should be limited to intersession recesses, but each of these lines frays too easily. To begin with, there is no evidence that the Framers based the terms used in the Constitution on Jefferson’s A Manual of Parliamentary Practice and the Majority readily admits that the correlation between the Constitution’s terminology and Jefferson’s treatise is rather tenuous. (Majority Op. at 223.) Further, while it may be reasonable to assume that the Framers were aware of the parliamentary procedures described by Jefferson in A Manual of Parliamentary Practice, it is less reasonable to assume that the Framers intentionally based their use of “recess” and “adjournment” in the Constitution on particular terms used in Jefferson’s treatise without any reference.[13]
The Majority’s discussion of early state constitutions is similarly off the mark. Noticeably absent from the Majority’s analysis of state constitutions is any reference to the constitution of North Carolina, which is generally accepted as a model used by the Framers in drafting the Recess Appointments Clause. See Noel Canning, 705 F.3d at 501; Office of Legal Counsel, Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions, 36 Op. O.L.C. 1, 10 n. 14 (2012) (“The [Recess Appointments] Clause, which was proposed by a North Carolina delegate, is generally considered to have been based on a similar provision then in the North Carolina Constitution.”). Further, despite the Majority’s reliance, it is unclear that the Massachusetts and New Hampshire constitutions have any connection to “the Recess” except for the fact that representatives from those states ratified the Constitution.
Finally, based on its analysis of a smattering of early state practices and state constitutions, the Majority concludes that “Recess” must refer to a break of a “considerable period of time” and must be marked by when the Senate adjourns. This point fares no better. One flaw in these two characteristics is that a “considerable period of time” lacks a limiting principle since “considerable” is a relative term. (Unsurprisingly, the Majority finds such a lack of a limiting principle problematic for intrasession recesses.) While I agree that “Recess” does not refer to the day-to-day recesses between daily sessions of the Senate (or its breaks for lunch and the weekend), the Majority’s method of interpretation is dubious. From a mere three instances of intrasession breaks by three state governors over 200 years ago, the Majority extrapolates this characteristic. (Majority Op. at 226.) But three actions by different state governors is thin ice upon which to interpret our Constitution.
B. The Intent of the Framers and the Purpose of the Recess Appointments Clause
While the proper starting point, textual interpretation of the Recess Appointments Clause is nettlesome because the Constitution was not written with a definition of terms section. With such difficulty in its *254 textual interpretation, other sources, namely the intent of the Framers, the purpose of the Constitution and its Recess Appointments Clause, and the tradition and practice of the President and the Senate, are pivotal in arriving at an intelligent and sensible definition of “the Recess”.
1. The Framers’ Intent
The Framers’ purpose in creating the separation of powers was to devise a system of equal give and take, so that the President and the Senate, while not beholden to each other, would be forced to work with each other and reach compromise.[14] By protecting the governmental architecture that the Framers inscribed in the Constitution, the inclusion of intrasession recesses in “the Recess” is most faithful to the intent of the Framers. The Majority’s definition of “the Recess” essentially tips that balance in favor of the Senate and, therefore, upsets the applecart of the balance of powers. The Majority states that the “most significant weakness” of the in-trasession recess definition is that it lacks a discrete day limit. But nothing in the Constitution or the intent of the Framers suggests that such a finite day limit is necessary to the definition of the Recess Appointments Clause. The fragile balance of power underlying the recess appointments process is inconsistent with specific time strictures and neither the Constitution nor the Framers contemplated such exactitude.
In The Federalist No. 67, Hamilton established that the President’s recess appointment power is “nothing more than a supplement” and an “auxiliary method of appointment” to be used when “the general method [of seeking the Senate’s advice and consent] was inadequate.” The Federalist No. 67, at 409 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Beyond these few sentiments, the Recess Appointments Clause cannot be fully understood in isolation but only within the fabric and spirit of the Constitution as a whole. Other Federalist papers, which describe the separation of our government’s powers, instruct that the power of appointment must be coordinated so that no branch can “possess, directly or indirectly, an overruling influence over the others.” The Federalist No. 48, at 308 (James Madison) (Clinton Rossiter ed., 1961). The wisdom of this structuring is borne out in the appointments process because the recess appointment power and the advice and consent power, as any well-defined check, are not absolute, but cabined, in their design.
While it cannot function as an absolute negative, the recess appointment power must provide some balance to the Senate’s power to provide or withhold advice and consent. The Federalist No. 73, at 442 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (“From these clear and indubitable principles [of legislative overreach] results the propriety of a negative, either *255 absolute or qualified, in the executive upon the acts of the legislative branches.”). Both James Madison and Hamilton recognized the zealousness of the legislature and the importance of establishing checks to counteract its overruling influence. The Federalist No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961) (explaining that, while the executive predominates in a monarchy, “[i]n republican government, the legislative authority necessarily predominates”). Without such a counterbalance, the Senate’s advice and consent power could degenerate into an absolute negative that would undermine the President’s recess appointment power, along with the entire appointments process.[15] See The Federalist No. 48, at 309-10 (James Madison), No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961).
Consequently, to protect this separation and balance of powers, the President must be formidable enough to countermand Congress and prevent the Senate from eviscerating his appointments prerogative through its use of advice and consent. See Myers, 272 U.S. at 116-17, 47 S.Ct. 21 (“The debates in the Constitutional Convention indicated an intention to create a strong executive.... ”). It is critical that the President be afforded greater checks to guard against the coercion of Congress since the executive is the inherently weaker branch of government. The Federalist No. 51, at 322-23 (James Madison) (Clinton Rossiter ed., 1961) (“As the weight of the legislative authority requires that it should be thus divided, the weakness of the executive may require, on the other hand, that it should be fortified.”).
In many ways, the check of the Recess Appointments Clause also resembles the Pocket Veto Clause in Article I, Section 7. Interestingly, Justice Joseph Story remarked that without the pocket veto “[C]ongress might ... defeat the due exercise of [the President’s] qualified negative by a termination of the session, which would render it impossible for the President to return the bill.” 2 Joseph Story, Commentaries on the Constitution § 888, at 354-55 (1833). Likewise, without intra-session recess appointments, the Majority’s position makes it impossible for the President to exert his necessary influence in the appointment of his executive officers since the Senate could too easily wrest that power from him through procedural machinations.[16]
*256 With these considerations in mind, courts must proceed carefully in construing the executive power narrowly. The stakes are too high and the consequences too dire if the executive power is unduly constricted. See Marshall Field & Co. v. Clark, 143 U.S. 649, 670, 12 S.Ct. 495, 36 L.Ed. 294 (1892) (assessing the severe consequences of the judiciary interceding in the actions of the other branches of government); Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 640, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (“However, because the President does not enjoy unmentioned powers does not mean that the mentioned ones should be narrowed by a niggardly construction.”).
Ultimately, the executive power must be strong enough to allow the President to “take Care that the Laws be faithfully executed” and “Commission all the Officers of the United States.” U.S. Const, art. II, § 3, cl. 1. The central role of the President in appointing the officers serving his branch of government was devised by the Framers with great purpose. See Myers, 272 U.S. at 117-19, 47 S.Ct. 21. By having a hand in choosing the officers serving in his branch, the President would be able to surround himself with the people he believed best fit to help him fulfill his duty to faithfully execute the laws under the Take Care Clause. See id. Not only does he need to have input in the officers chosen, but the President needs the power to keep offices occupied in order to keep his branch and the government, as a whole, running. Therefore, ensuring that the Senate does not unduly encroach upon the President’s role in the appointments process is integral to ensuring that the President is able to faithfully execute his duties. Id. at 117-18, 47 S.Ct. 21 (“[The President’s] selection of administrative officers is essential to the execution of the laws by him.... ”).
2. The Purpose of the Recess Appointments Clause
The purpose of the Recess Appointments Clause, which is much more ascertainable than the textual interpretation of “the Recess”, offers further guidance in this construction of the Recess Appointments Clause and the meaning that should be ascribed to “the Recess”. In The Federalist No. 67, Hamilton pinpointed the dual purposes of the Recess Appointments Clause, which are 1) to allow the Senate to take breaks and 2) to keep offices filled (since “it might be necessary for the public service to fill [vacancies] without delay”).[17] The Federalist No. 67, at 410 (Alexander Hamilton) (Clinton Rossiter ed., 1961). To Madison, this meant that the Senate would be recessed for purposes of the Recess Appointments Clause when Senators were not in “continual residence” in the Capitol. 3 Elliott’s Debates 409-10 (statement of James Madison at the Virginia convention).
Thus, as imagined by the Framers, the Recess Appointments Clause had a two- *257 part purpose: to allow the Senate to break from its usual business and, in that absence, to allow vacant offices to be filled in order to keep the machinery of government running. See Evans, 387 F.3d at 1226 (“[W]hat we understand to be the main purpose of the Recess Appointments Clause — to enable the President to fill vacancies to assure the proper functioning of our government — supports reading both intrasession recesses and intersession recesses as within the correct scope of the Clause.”).
The Majority claims that a “crucial” purpose of the Recess Appointments Clause is to preserve the Senate’s advice and consent power by limiting the President’s unilateral appointment power. (Majority Op. at 228-29.) This misses the intent of the Framers. It is indisputable that the Recess Appointments Clause gives the President additional power, so why would the Framers limit the President’s power by giving him additional power? There is no dispute that there are limitations written into the Recess Appointments Clause, but all the separate powers of the appointments process have limitations despite being drafted to give a branch enhanced power. Further, nothing in the contemporaneous writings, especially The Federalist Papers, claims that this was a “crucial” purpose of the Recess Appointments Clause, let alone any other purpose.
In the words of Justice Story, the purpose of the Recess Appointments Clause was “convenience, promptitude of action, and general security.” 3 Joseph Story, Commentaries on the Constitution § 1551, at 410 (1833). Moreover, consistent with the Framers’ principles underlying the framework of our republic, the purpose of the Recess Appointments Clause was also to provide a check on the Senate’s control over the appointment of officers by sharing the power of confirmation with the executive branch. Allowing the advice and consent of the Senate to act as an absolute negative on the President’s nominations without a check would defeat the dual purposes of the Recess Appointments Clause and allow “advice and consent” to be aggrandized into the “mandate and order” of the Senate. See Myers, 272 U.S. at 118, 47 S.Ct. 21 (characterizing the Senate’s advice and consent as a “limitationf ] upon the general grant of the executive power, and as such, being [a] limitationf ], should not be enlarged beyond the words used”).
As a check, though, the Recess Appointments Clause is by no means absolute. Thus, although allowing the President to make intrasession recess appointments increases his clout in the appointments process, his power to make recess appointments has embedded limitations. First, the recess appointment power can only be used when the Senate is recessed. If the Senate wants to curb the President’s use of recess appointments, it can simply remain available to provide advice and consent, thereby forcing the President to rely on its advice and consent in making appointments.[18] Second, recess appointments have a temporary duration since they only last until “the End of [the Senate’s] next Session.” At most, this allows the term of a recess appointee to last the length of two regular sessions (under current Senate practices, this equates to a maximum of approximately two years). Third, as evidenced by the structure of Article II, Section 2, the recess appointment power can only be a secondary means of appointing officers and can never *258 be used as a primary means of doing so as long as the Senate is available to provide advice and consent.
Nevertheless, the Majority concludes that intrasession recess appointments would allow the President to circumvent the Senate’s role in the appointments process; however, protection against such circumvention is built into the Recess Appointments Clause. By these three limiting principles, alone, the President pays a steep price for using his recess appointment power. See United States v. Woodley, 751 F.2d 1008, 1014 (9th Cir.1985) (en banc) (observing that a recess-appointed Article III judge “lacks life tenure and is not protected from salary diminution” such that the “[recess appointment] power is not unfettered ... but is subject to its own limitations and safeguards”). Indeed, these strictures on the President’s recess appointment power prevent him from usurping the Senate’s power to provide advice and consent. Moreover, use of the recess appointment power during intrasession recesses does not undermine the reason why the Framers granted the Senate the power of advice and consent, which was preventing larger states from having a disproportionate influence on appointments, any more than use of the recess appointment power during intersession recesses. See Myers, 272 U.S. at 119-20, 47 S.Ct. 21. With these strictures, the Majority’s concern about the President making unannounced recess appointments “by waiting until [the Senators] go home for the evening” is not fathomable. (Majority Op. at 230.)
But these are not the only limiting principles cabining the President’s recess appointment power. In addition to these express checks, there are implicit checks on the use of his recess appointment power that were recognized by the Framers. Firstly, as explained in The Federalist Papers, the structure of the branches of government, as conceived by the Constitution, give the President a very strong interest in maintaining the favor of the Senate and not stoking its ire. The Federalist No. 77, at 459 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (“[A] new President would be restrained from attempting a change in favor of a person more agreeable to him by the apprehension that a discountenance of the Senate might frustrate the attempt, and bring some degree of discredit upon himself.”). Secondly, the President is beholden to public opinion. See The Federalist No. 73, at 444 (Alexander Hamilton) (Clinton Rossiter ed., 1961); 3 Joseph Story, Commentaries on the Constitution § 1523, at 375 (1833) (“He will be compelled to consult public opinion in the most important appointments.... If he should act otherwise, and surrender the public patronage into the hands of profligate men, or low adventurers, it will be impossible for him long to retain public favour.”); Myers, 272 U.S. at 123, 47 S.Ct. 21. Because of public opinion, the President is ineentivized to use his recess appointment power sparingly, lest the public perceive that he is trying to thwart the advice and consent of the Senators that they have elected to office, or lest the public lack faith in his appointees because they have not been vetted by the Senators that they have elected to office. Thirdly, as far as mechanics, the Senate can check the President’s use of his recess appointment power during intrasession recesses by controlling when it recesses and how long it stays in regular sessions. As a result, it can control if the President is able to use his recess appointment power at all and how long his recess appointees will remain in office.
What the Majority overlooks is the following: The problem with limiting the Recess Appointments Clause to intersession recesses is that such an interpretation di *259 sarms the reciprocal checks that the President needs to have on the Senate. While the President pays a steep price for foregoing the advice and consent of the Senate, the Senate pays a relatively low price for thwarting the President’s power to make recess appointments by, for example, reducing its intersession recesses to negligible periods of time (for instance, one day). Consequently, the safeguard against the encroachment of the Senate on the power of the President is much weaker. The great harm is that the Senate may engage in machinations, as some would argue is the case with pro forma sessions, to avoid voting on nominees in order to strong-arm the President into capitulating to its demands, forcing the President to nominate the Senate’s preferred candidates or else leave offices vacant, as Hamilton expressly feared. It is inconceivable that the Framers intended such strong-arming by the Senate; of equal, and possibly greater, concern is the House’s involvement in the strong-arming, which surely was not intended by the Framers.[19] See The Federalist No. 51, at 322 (James Madison), No. 73, at 442-43 (Alexander Hamilton), No. 76, at 455-56 (Alexander Hamilton), No. 77, at 463 (Alexander Hamilton) (Clinton Rossiter ed., 1961).
Therefore, the President must be able to exercise his recess appointment power whenever the Senate is not available to provide advice and consent, including when the Senate is holding pro forma sessions, when it is not readily available to be present to deliberate and vote on nominees. Just as it is incredulous to suggest that the President can make recess appointments during the Senate’s lunch, it is equally incredulous for the Majority to suggest that advice and consent can be provided in thirty-second increments once every three days. (In fact, it may be more incredulous since it presumably takes longer than thirty seconds for 100 Senators to act on a nomination.) Further, conducting business via unanimous consent agreement, as the Senate did on December 23, 2011, is not the type of business that yields the advice and consent envisioned by the Framers.[20]
The Constitution does not contemplate that the Senate may have it both ways. The Senate cannot be both unavailable and yet force the President to submit to its advice and consent. This dynamic acts as a check on Senate coercion (and House coercion) because, in order to take recesses and breaks from its regular business, the Senate will either have to cooperate *260 with the President and figure out mutually acceptable nominees or will have to yield its advice and consent power to the President’s recess appointment power. ■
Along these lines, the Supreme Court has applied a functional approach in determining the scope of executive powers. It did so in determining when the Senate is available to receive a bill from the President for the purposes of the Pocket Veto Clause, concluding that having a secretary of the Senate present was sufficient, even if the members of the Senate had already departed to their home states. See The Pocket Veto Case, 279 U.S. at 680, 49 S.Ct. 463 (holding that “the determinative question in reference to an ‘adjournment’ is not whether it is a final adjournment of Congress or an interim adjournment, such as an adjournment of the first session, but whether it is one that ‘prevents’ the President from returning the bill to the House in which it originated within the time allowed”).
Of course, providing advice and consent on nominees likely requires more on the part of Congress than receiving a bill from the President — unlike with the Pocket Veto Clause, one person cannot generally provide advice and consent on behalf of all 100 Senators. If this functional approach is used to effect the purposes of the Recess Appointments Clause, then the President must be able to make recess appointments when the Senate cannot provide advice and consent, and it is certainly possible for the Senate to lack that capacity to provide advice and consent during intra-session recesses when its members are not present in the Senate chamber to vote.
Pro forma sessions, if accepted as valid, undeniably frustrate the purposes of the Recess Appointments Clause. The pro forma sessions, and Congress’s other attempts to manipulate the appointments process, appear to be the type of legislative overreaching chronicled by the Framers. See The Federalist No. 48, at 309 (James Madison) (Clinton Rossiter ed., 1961) (“The legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex.”). From Madison’s sentiments, it is also evident that the legislature was not the “more feeble” branch that would need a “more adequate defense” but, rather, the branch that would enfeeble the other branches and require that they be more adequately defended against such machinations. See id.
Moreover, under a functional approach, pro forma sessions cannot prevent the Senate from recessing for the purposes of the Recess Appointments Clause. When a pro forma session is held for approximately thirty seconds by a single Senator, the Senate is not able to accomplish the function of deliberating about and voting on the President’s nominees.[21]
Indeed, the Framers could have faced the same dilemma faced by the President in 2010 and 2012 since it was entirely possible for the Senate to take short intra-session recesses early in our republic. In such an event, how would the Framers have intended for the Recess Appointments Clause to operate? They did not condition the Recess Appointments Clause on how far away Senators were from the Capitol when they recessed, or how long it *261 would take them to return to the Capitol— they simply and only conditioned the Recess Appointments Clause on whether the Senate was in a recess, breaking from its regular business, and unable to ■ provide advice and consent. Or what if the Senate remained in pro forma sessions while it broke for six to nine months, as was its routine at the time of ratification, hoping that this would prevent the President from making recess appointments?
In such scenarios, the Framers would have empowered the President to make recess appointments. An empty office is an empty office. It makes no sense that the Framers would have differentiated between intrasession and intersession recesses in effectuating the purpose of the Recess Appointments Clause. See Evans, 387 F.3d at 1226 (“The purpose of the Clause is no less satisfied during an intra-session recess than during a recess of potentially even shorter duration that comes as an intersession break.”). The atrophy of agencies and other offices caused by the Senate’s absence did not then, and does not now, depend on whether the Senate is unavailable due to an intersession recess or intrasession recess — -all that matters is the length of time that the Senate is away from its usual business, unable to provide advice and consent, while vacancies persist.[22]
Accordingly, the lack of an exact limiting principle, such as a day limit, does not provide sufficient reason to exclude intra-session recesses from “the Recess”. First of all, any limit would be arbitrary. The ten-day limit proposed by Attorney General Daugherty, who issued the 1921 opinion in support of intrasession recess appointments, was not based on any identifiable principle; such a hard limit could be tied to the Pocket Veto Clause but there is no proof of a relationship between it and the Recess Appointments Clause and the processes of each are different, as conceived by the Framers and in the Constitution. The only day limit that might not be arbitrary is the three-day limit based on the Adjournments Clause but, as discussed, there is no real connection between the Adjournments Clause and the Recess Appointments Clause.
An alternative explanation for such a three-day limit would be that a recess of two days, over a weekend, should not constitute a recess sufficient to take the Senate away from its business. See Edward A. Hartnett, Recess Appointments ofArti- *262 ele III Judges: Three Constitutional Questions, 26 Cardozo L.Rev. 377, 419-20 (2005). This would also prevent the extreme situation of lunchtime appointments and overnight appointments between daily sessions, which no party, and no court, has suggested is reasonable.
Due to this lack of a limiting principle, the Majority blithely asserts that intrasession recesses would betray the purpose of the Recess Appointments Clause because it would allow the President to make recess appointments any time the Senate breaks from its usual business, such as when it recesses for lunch or adjourns at the end of a daily session. The Majority is mistaken because there is no evidence that the Framers intended for the Recess Appointments Clause to be used this way and there is no evidence that any President ever has. It is beyond contention that the President cannot use his recess appointment power during the Senate’s lunch break, when it adjourns nightly between daily sessions, or when it adjourns for the weekend. See Noel Canning, 705 F.3d at 500 (determining that “the Framers intended something specific by the term ‘the Recess,’ and that it was something different than a generic break in proceedings”). All of these recesses are regular breaks of the Senate, which do not impede its normal business. It would be preposterous to suggest that the Framers intended for the Senate to be held hostage in its chamber in order to retain its power to provide advice and consent.
The Majority’s concern about the “temporal reach” and duration of intrasession recesses also overlooks the reality that there is little difference between the tem-porality of intersession recesses and intra-session recesses in theory or in practice. If the concern is that intrasession recesses may be too short, then one must also recognize that intersession recesses can be just as short or shorter than intrasession recesses. Similarly, if the concern is that “the Recess” must last a “non-negligible” number of days, then one must recognize that either an intersession or intrasession recess can last a “negligible” number of days. Consequently, it is indisputable that intersession recess appointments are vulnerable to the same uncertainties and lack of limiting principles as intrasession recess appointments. This conclusion cannot be saved by the magic words — the Senate “adjourned sine die”. .
The need to exclude recess appointments during the Senate’s adjournments for lunch, the night, and the weekend would explain why the Framers chose to use the limited term “Recess” rather than the all-encompassing term “Adjournment” in the Recess Appointments Clause. “Recess” allows the Senate some leeway to take brief adjournments without recessing in a way that permits the President to make appointments without its advice and consent. As the Majority itself contends, “the dichotomy [between the use of ‘Adjournment’ and ‘Recess’] must be that adjournment results in more breaks than recess does.” (Majority Op. at 232-33.)
Further, it would appear unconstitutional for the President to use his recess appointment power to make appointments during those routine breaks of the Senate. As detailed below, by sitting on his nominations and sabotaging the Senate in such a way, the President would not be using the advice and consent of the Senate as his primary means of appointing officers, in contravention of the plain structure and clear intent of the Framers.
The Majority also suggests that the purpose would be betrayed by allowing intra-session recess appointments because they are subject to variable lengths: An intra-session recess appointment made at the beginning of a regular session would last *263 two regular sessions, while an intrasession recess appointment made at the end of a session would only last one regular session. But nothing in the text of the Constitution, the intent of the Framers, or the purpose of the Recess Appointments Clause provides evidence that such variability is violative. Firstly, variable lengths are not inherently forbidden by the Constitution. The check on the Recess Appointments Clause, by the plain language of the text of the Constitution, is that recess appointments have a fixed end, not necessarily a fixed length. There is no language to intuit that the Framers had intended otherwise. Secondly, intersession recess appointments are also prone to variable lengths: An intersession recess appointment made at the beginning of a three-month recess will last three months longer than an appointment made at the end of that intersession recess. Of course, post-ratification, when intersession recesses routinely lasted six months or longer, the lengths of recess appointments could have been even more disparate.
The Majority claims that the “End of their next Session” language in the Constitution also excludes intrasession recesses from the definition of “the Recess” because that language allows the Senate only a “single chance” to weigh in on appointments. (Majority Op. at 234-36.) But nothing in the language of the Constitution or the intent of the Framers limits the Senate to a “single chance” at providing advice and consent. Even in the passage quoted by the Majority, Justice Story only requires that the Senate have “an opportunity” to act, rather than a “single opportunity”. (Majority Op. at 234.) What if an appointment is pending during one regular session and the President does not make any recess appointments during the ensuing intersession recess — is the Senate no longer able to provide advice and consent in the next regular session because it has already had a “single chance” to provide advice and consent?
In this manner, including both intersession and intrasession recesses within the scope of the recess appointment power best realizes the purpose of the Recess Appointments Clause, i.e., to keep offices filled and allow the Senate to break from its regular business.
C. The Branches’ Historical Tradition and Practice
The historical tradition and practice of the branches of government is also very persuasive evidence of the meaning of the Constitution and endorses the propriety of including intrasession recesses in “the Recess”. See Mistretta v. United States, 488 U.S. 361, 401, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); The Pocket Veto Case, 279 U.S. at 688-89, 49 S.Ct. 463; Freytag v. Comm’r of Internal Revenue, 501 U.S. 868, 890, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (faulting an interpretation of the Constitution that “would undermine longstanding practice”); Youngstown, 343 U.S. at 610, 72 S.Ct. 863 (Frankfurter, J., concurring) (“Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them.”). But see INS v. Chadha, 462 U.S. 919, 944-45, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (noting that the long-term practice of the one-house legislative veto could not save it from being held unconstitutional). Moreover, as I have, the Supreme Court found its more expansive reading of the Pocket Veto Clause corroborated by the “[l]ong settled and established practice” of the President, which it said is to be accorded “great weight in a proper interpretation of constitutional provisions of this character.” The Pocket Veto Case, 279 U.S. at 689, 49 S.Ct. 463.
*264 Further, in reviewing the tradition and practice of the President, presidential actions are entitled to a presumption of constitutionality.[23] The Majority rejects any such notion that presidential actions deserve special regard, but the Supreme Court has repeatedly embraced such a principle. United States v. Nixon, 418 U.S. 683, 703, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (recognizing that “courts have traditionally shown the utmost deference to Presidential responsibilities”); Chadha, 462 U.S. at 951, 103 S.Ct. 2764 (“When any Branch acts, it is presumptively exercising the power the Constitution has delegated to it. When the Executive acts, it presumptively acts in an executive or administrative capacity as defined in Art. II.” (citing J.W. Hampton & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928))); see also Evans, 387 F.3d at 1222 (“And when the President is acting under the color of express authority of the United States Constitution, we start with a presumption that his acts are constitutional.... Just to show that plausible interpretations of the pertinent constitutional clause exist other than that advanced by the President is not enough.”); United States v. Allocco, 305 F.2d 704, 713-14 (2d Cir.1962). Not only does the President take an oath of fealty to the Constitution, and not only is his most important constitutional duty to “take Care that the Laws be faithfully executed,” but such a presumption is integral to the operation of the executive branch. See Youngstown, 343 U.S. at 610-11, 72 S.Ct. 863 (Frankfurter, J., concurring) (establishing that a practice “engaged in by Presidents who have also sworn to uphold the Constitution ... may be treated as a gloss on ‘executive Power’ ”).
The Majority carves out its own exception, suggesting that, in particular, no such presumption applies in separation of powers cases, but this presumption should apply with the most force in such cases. In executing the duties of his office, the President must not be hindered because the constitutionality of his actions is held in doubt. See Baker v. Carr, 369 U.S. 186, 210-11, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (emphasizing the importance of respecting the finality of the actions of the political branches); Nixon v. United States, 506 U.S. 224, 236, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (same). For a host of self-evident reasons, the judiciary should avoid upending longstanding practices of the other branches unless they are plainly unconstitutional. See Noel Canning, 705 F.3d at 515 (Griffith, J., concurring); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 345-48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring) (acknowledging principles of judicial restraint regarding constitutional questions).
1. The Tradition and Practice of the President
The tradition and practice of the President, especially since 1947, unequivocally shows that intrasession recess appointments have been continuously accepted as a constitutional use of the executive power. Since 1947, Presidents have made nearly *265 400 intrasession recess appointments without significant rebuke or controversy. See Henry B. Hogue et al., Cong. Research Serv., The Noel Canning Decision and Recess Appointments Made from 1981-2013, at 4 (Feb. 4, 2013). As it stands, intrasession recess appointments have been made as often as intersession recess appointments. Id. In addition, intrasession recess appointments have been condoned by the executive branch since at least 1921, even if they did not come into more common use until the 1940s. Despite this historical precedent, the Majority concludes that each of these Presidents has misinterpreted the Constitution.
Recess appointments have been used by Presidents ever since the birth of our republic. President Washington, himself, made several recess appointments. See Edward A. Hartnett, Recess Appointments of Article III Judges: Three Constitutional Questions, 26 Cardozo L.Rev. 377, 385, 387 (2005). The recess practices of the Senate have evolved, though, which has caused recess appointment practices to evolve in response. Early in our republic, the Senate did not take intrasession recesses and Took much longer intersession recesses than it does currently. See Congressional Directory for the 112th Congress 522-38 (2011).[24] According to the Congressional Directory, only five intra-session recesses were taken before 1860 and, of those five, the two longest were thirteen days. Id. After 1860, there was a surge in intrasession recesses and, since the 37th Congress, there has been at least one intrasession recess in each Congress, with the exception of approximately five sessions of Congress (out of approximately 150 regular sessions of Congress). Id. Thus, intrasession recesses have been the norm since 1860. Currently, the Senate takes between five and ten intrasession recesses each Congress, meaning that in-trasession recesses far outnumber intersession recesses. See Henry B. Hogue, Cong. Research Serv., Recess Appointments: Frequently Asked Questions 2 (Jan. 9, 2012).
Despite the relatively early appearance of intrasession recesses, intrasession recess appointments did not come into vogue until the 1940s.[25] As mentioned, Presi *266 dents have made nearly 400 intrasession recess appointments since then. See Henry B. Hogue et al., Cong. Research Serv., The Noel Canning Decision and Recess Appointments Made from 1981-2013, at 4 (Feb. 4, 2013). Prior to 1947, there were only three recorded intrasession recess appointments. Noel Canning, 705 F.3d at 502 (citing Michael A. Carrier, Note, When Is the Senate in Recess for Purposes of the Recess Appointments Clause ?, 92 Mich. L.Rev. 2204, 2209-12, 2235 (1994)). The first is believed to have been made by President Andrew Johnson in 1867, which coincides with the surge in intrasession recesses that began in the 1860s. See Noel Canning, 705 F.3d at 501. As such, there is no reasonable inference that can be drawn about intrasession recesses except that the practices of the Senate prior to the Twentieth Amendment made the timing of recesses less of an issue than is the case now.
In the modern day, intrasession recesses are not only more frequent but also longer than they had been in the past. In fact, they are sometimes longer than some intersession recesses, which can be as short as a day.[26] With the large number of intrasession recesses taken, the net duration of intrasession recesses during a session of the Senate will often dwarf the net duration of intersession recesses, which means that the Senate is on break more often during sessions than between sessions.
As reflected earlier, given that recess appointments have been made for over 220 years and that no intrasession (or intersession) recess appointment has been made during a recess of less than ten days in at least the last thirty years, critics are wanting to allege that the President would abuse his executive power and make a recess appointment while the Senate broke for lunch or the end of the day. In the history of our republic, there has been no inkling that any President has engaged in that practice and, so, there is no reason to think that will happen now. See Allocco, 305 F.2d at 714 (“We have not been directed to a single instance of behavior by any President which might be termed an ‘abuse’ of the recess power.”).
2. The Tradition and Practice of the Senate
The tradition and practice of the Senate also affirms that “the Recess” includes both intrasession and intersession recesses. In 1903, President Roosevelt made 160 recess appointments during what is literally described as a momentary intersession recess between the 1st and 2nd sessions of the 58th Congress. T.J. Hal-stead, Cong. Research Serv., Recess Appointments: A Legal Overview 10 (July 26, 2005). In response to these recess appointments by President Roosevelt, the Senate Judiciary Committee engaged in a project to opine on whether such a “constructive recess” of the Senate constituted “the Recess” of the Recess Appointments Clause. The committee concluded that it did not. Most telling was the 1905 report, which presented the Senate’s view of the meaning of “recess”, as used in the Recess *267 Appointments Clause. The 1905 Report determined that “[t]he word ‘recess’ is one of ordinary, not technical, signification” and is used in the Recess Appointments Clause “in its common and popular sense.” S.Rep. No. 58-4389, at 1 (1905) (emphasis added).
This report, if nothing else, endorses a broader, rather than a narrower, reading of the term “Recess” in the Recess Appointments Clause. Specifically, the 1905 Report explained that “recess” was “evidently intended by the [FJramers of the Constitution that it should mean something real, not something imaginary; something actual, not something fictitious.” Id. at 2 (emphasis added). Very pragmatically, the 1905 Report set forth four criteria for qualifying a “recess”: 1) the Senate is “not sitting in regular or extraordinary session as a branch of the Congress, or in extraordinary session for the discharge of executive junctions,” such that 2) “its members owe no duty of attendance,” 3) “its Chamber is empty,” and 4) “it can not receive communications from the President or participate as a body in making appointments” “because of its absence.” Id. (emphasis in original).
In addition to the intent of the Framers and the tradition and practice of the President, this definition from the 1905 Report forecloses the possibility of the President making recess appointments when the Senate breaks for lunch, for the night, and for the weekend. During those breaks, the Senate’s capacity to participate as a body in the appointments process is not hampered any more than usual. In the same way that one of these brief, routine breaks does not make the Senate unavailable to provide advice and consent, a brief session does not make the Senate available to provide advice and consent, which is why the Senate cannot possibly provide advice and consent during pro forma sessions.
The 1905 Report also postulated that the Framers intended for the Recess Appointments Clause to serve dual purposes that could not be served if those criteria were met: to prevent “grave inconvenience and harm to the public interest” and to ensure that “at all times there should be, whether the Senate was in session or not, an officer for every office, entitled to discharge the duties thereof.” Id. at 2 (emphasis added). This accords with the purposes established by Hamilton in The Federalist No. 67.
The Senate has not officially changed positions since the issuance of this report. See Nippon Steel Corp. v. Int’l Trade Comm’n, 239 F.Supp.2d 1367, 1374 n. 13 (C.I.T.2002) (citing Michael A. Carrier, Note, When Is the Senate in Recess for Purposes of the Recess Appointments Clause?, 92 Mich. L.Rev. 2204 (1994)).
Additionally, in an act of legislative acquiescence, Congress has passed legislation that observes the possibility of intra-session recess appointments.[27] By its own choice, Congress passed, and has not since repealed, the Pay Act, a statute that allows recess appointees to be paid and does not differentiate between intersession and in-trasession recess appointees. 5 U.S.C. § 5503; see Evans, 387 F.3d at 1226; Woodley, 751 F.2d at 1013.
II. The Validity of the March 27, 2010 and January 4, 2012 Reoess Appointments
Based on the foregoing analysis, in my judgment, the recess appointments of *268 Member Becker on March 27, 2010 and Members Block, Flynn, and Griffin on January 4, 2012 are valid. Both sets of appointments were made during intrasession recesses when the Senate was not available to provide advice and consent. The President appropriately exercised his discretion, relying on the supplemental power of the Recess Appointments Clause to keep those offices filled for the sanctity of the public. The exclusion of intrasession recesses from the definition of “the Recess” denies him the ability to fulfill his constitutional duty and leads to a number of absurd results.
The Majority claims that the Senate was available to provide advice and consent during the pro forma sessions because it could have acted on the Members’ nominations “if it had desired to do so.” (Majority Op. at 231.) But this is an assumption with dangerous logical extensions. Under the Majority’s logic, the Senate would always be available to provide advice and consent and the President would never be able to make recess appointments. Even during intersession recesses, the Senate could plausibly provide advice and consent “if it [ ] desired to” by simply cutting its intersession recess short. It is not as if the Senate is paralyzed while in an intersession recess.
To demonstrate another absurd result, Riddick’s Senate Procedure documents that there is such a thing as a conditional sine die adjournment, which could allow the Senate Majority leader to call the Senate back into session on 24 hours’ notice to resume the previous session — would such a conditional sine die adjournment to start an intersession recess prevent the Senate from fulfilling its desire to provide advice and consent? See Riddick’s Senate Procedure 18; Henry B. Hogue, Cong. Research Serv., Recess Appointments: Frequently Asked Questions 1-2 (Jan. 9, 2012) (“These adjournment resolutions today usually authorize leaders of each chamber to call it back into session after the sine die adjournment. If this power is exercised, the previous session resumes and continues until the actual sine die adjournment is determined, usually pursuant to another concurrent resolution of adjournment.” (emphasis added)).
Under the Majority’s interpretation of “the Recess” as an intersession recess, the Recess Appointments Clause is essentially neutered and the President’s ability to make recess appointments would be eviscerated. A Senate opposed to the President’s nominees would simply limit its intersession recesses to a day, or less, and use its power to provide advice and consent as an absolute negative to the President’s power of appointment. It could then simply convert what would have been its intersession recess, when Senators would depart to their home states and not conduct business, into an intrasession recess. Thus, by this simple procedural change in title, the Senate would strip the President of this essential counterbalance in the exercise of his executive power and upset the balance of power. In a worst-case scenario, some offices could remain vacant for an entire administration, which could be as long as eight years. In addition, the Senate would have a disproportionate amount of influence on the President’s nominees, since he would likely have to accede to the demands of the Senate’s absolute negative.
If anything, the Majority’s test — that an adjournment sine die marks an intersession recess — is unworkable and not judicially manageable. Under the Majority’s rationale, the President could make a recess appointment during any intersession recess, even if it only lasted a nanosecond, yet could not make a recess appointment during a six-month intrasession recess. *269 This defies common sense and common logic. The Majority itself recognizes that intersession recesses suffer from the same lack of an exact durational limit as intra-session recesses, which undercuts its suggestion that intersession recesses are somehow immune to its criticism of intra-session recesses. (Majority Op. at 244 (“[T]he lack of a constitutional basis for selecting a long duration in defining intra-session breaks is just as absent to define intersession breaks.”).)
The Majority further undercuts its distinction between intersession and intrasession recesses by stating, without reservation, that “the potential for abuse and subsequent gridlock lies not in what recess means but in the Constitution’s framework of divided powers.” (Majority Op. at 244.) This admits that the problem, and solution, lies not in the technical, procedural classification of the Senate’s adjournment, but in whether the separation of powers is maintained. Thus, tying the definition of “Recess” to the availability of the Senate to provide' advice and consent achieves the proper focus. It does so by basing the definition on the presence of the Senate’s mechanism for maintaining the separation of powers in the appointments process — advice and consent — rather than the procedural classification of the recess.
Worse, by basing the recess appointment power on the Senate’s procedure, the Majority has committed the Recess Appointments Clause to the Senate’s discretion and procedural manipulations. The impracticability of the Majority’s standard is shown by the fact that the January 4, 2012 appointments issue could have simply been avoided if the appointments had been made a day earlier, on January 3, during the intersession recess.[28] Not only that, but the Majority’s standard would also allow the President to make an unlimited number of recess appointments during the type of “fictional” intersession recess exploited by President Roosevelt in 1903. With such absurd results, the Majority’s standard is an artifice that would clearly upset the separation of powers integral to a sound appointments process.
Under my standard, the entire period during which the Senate held pro forma sessions, from December > 17, 2011 until January 23, 2012, would be treated the same. Thus, the Senate would have been no more able to provide advice and consent on January 4, 2012 than it was on January 3, 2012. And the President would not be able thwart the Senate, as President Roosevelt did, by making well over a hundred recess appointments during a fictional intersession recess of infinitesimal duration.
III. Conclusion
Defining the executive role in our system of checks and balances is one of the most challenging problems of our republic *270 and, consequently, not so easily resolved. The inclusion of intrasession recesses in the ambit of the Recess Appointments Clause is the interpretation most faithful to the text of the Constitution, the intent of the Framers, the purpose of recess appointments, and the tradition and practice of both the President and the Senate. It is for this reason that the Majority cannot articulate a constitutional impediment to the inclusion of intrasession recesses, or make a constitutional case for the categorical exclusion of all intrasession recesses. Interpreting “the Recess” to include intra-session recesses best maintains the balance of power integral to preserving the appointments process intended by the Framers.

. Given the procedural posture on appeal and the Majority’s holding, resolving the merits of whether New Vista’s Licensed Practical Nurses (LPNs) are supervisors is unnecessary at this time.

.I also disagree with the Majority’s conclusion that the group quorum requirement (what I believe the Majority refers to as the “three-member-composition” requirement) is jurisdictional. In New Process Steel, L.P. v. NLRB, 560 U.S. 674, 130 S.Ct. 2635, 177 L.Ed.2d 162 (2010), the Supreme Court does not use the word "jurisdictional”, or any variant thereof, and did not characterize the § 153(b) requirement as jurisdictional.

. The Majority’s definition of an intersession recess also includes recesses preceding and following extraordinary and special sessions of Congress, but such a holding is beyond the facts of our case. See Edward A. Hartnett, Recess Appointments of Article III Judges: Three Constitutional Questions, 26 Cardozo L.Rev. 377, 408 n. 136, 414-15 (2005).

. For one, the regular session of the Senate does not end when it takes an intrasession recess. See generally Congressional Directory for the 112th Congress (2011) (showing that the dates of intrasession recesses occur within the dates spanning the convening date and adjournment date of regular sessions of the Senate). For another, the House and the Senate, as one Congress, generally share the same regular session and the recess of one body, such as the Senate, does not interrupt the regular session of the House and Congress as a whole.

. This segues to an inherent weakness in restricting "the Recess” to intersession recesses. The House was largely responsible for the pro forma sessions because it refused to let the Senate take a longer recess due to the Adjournments Clause’s requirement that the House and Senate have the other body’s consent to "adjourn for more than three days.” U.S. Const, art. I, § 5, cl. 4; Office of Legal Counsel, Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions, 36 Op. O.L.C. 1, 2-3 (2012). Without doubt, the Framers did not intend for the House to single-handedly stall the appointments process. The plain and uncontestable text of the Appointments Clause makes it clear that only the President and the Senate are to consult on appointments. Nowhere in the Appointments Clause is the House mentioned. If "Recess” were limited to intersession recesses, because that is the only time when the Senate is not in a regular session, and the Senate is always available to provide advice and consent when in a regular session, then the House would be allowed to inject its whims into the appointments process by limiting even the duration of the intersession recess. This is because an adjournment of more than three days requires the imprimatur of the House under the Adjournments Clause. After all, the purpose of the Adjournments Clause is to make sure that one house of Congress cannot abandon the other in the legislative process, and the House cannot legislate with the Senate if it is not in session. See Edward A. Hartnett, Recess Appointments of Article III Judges: Three Constitutional Questions, 26 Cardozo L.Rev. 377, 379 (2005). If the Recess Appointments Clause was only triggered when the Senate ended a regular session, then a recess appointment made during an intersession recess of at least three days would effectively be subject to the approval of the House. The House could simply deny the Senate leave to adjourn in order to thwart the President’s ability to make recess appointments. In at least the last thirty years, the President has never made a recess appointment, of either the intersession or intrasession variety, during a recess of less than ten days. See Henry B. Hogue, Cong. Research Serv., Recess Appointments: Frequently Asked Questions 3 (Jan. 9, 2012). Based on that empirical data, it is highly improbable that, under these circumstances, the President would make a recess appointment without needing the House’s approval. This cannot be what the Framers *248 intended. See Noel Canning, 705 F.3d at 504 ("Without any evidence indicating that [the Recess Appointments Clause and Adjournments Clause] are related, we cannot read one as governing the other. We will not do violence to the Constitution by ignoring the Framers’ choice of words.”).

. As for a presence requirement, "presence” is not mentioned in the Appointments Clause but it is mentioned explicitly as a requirement of advice and consent in the Treaty Clause. U.S. Const, art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur. ...” (emphasis added)).

. The Pocket Veto Case and Wright, like other cases on other aspects of the executive power, are not wholly applicable to our decision but both certainly provide insight and counsel about how we should resolve what is an analogous issue.

. The Majority attempts to show that I, too, am reading a modifier into the Recess Appointments Clause by turning "the Recess” into "the Recess in which the Senate cannot provide Advice and Consent”. But there is a distinction between our approaches. If my definition can be considered a modifier, it only reflects how the Appointments Clause modifies the Recess Appointments Clause. While I limit the operation of the Recess Appointments Clause, as a whole, with another clause (the Appointments Clause), the Majority limits the word "Recess” with another word (the modifier). As opposed to the modifier that the Majority reads into the Constitution, the Appointments Clause already exists in the Constitution and is meant to modify the Recess Appointments Clause. Under my definition, any type of recess — be it intersession or intrasession — is considered "the Recess”, so I do not read a new modifier onto "the Recess” itself.

. The Majority also attempts to extract a sense of "permanence” and "longevity” from *251 dictionary definitions of “recess” at the time of ratification, but such vague terms lack any real substance. (Majority Op. at 40-41.) Even if the Majority’s qualifications, "permanence” and "longevity”, were persuasive, they would support recess appointments during long intrasession recesses and prohibit recess appointments during short intersession recesses. The longevity and permanence of a thirty-day. intrasession recess is no less than that of a thirty-day intersession recess. Moreover, as the Majority admits about a similarly vague descriptor, "there is no constitutional basis for defining Tong’ and the definition is unsupported by the other relevant constitutional provisions.” (Majority Op. at 238.)

. The Majority’s definition is even more technical since it intertwines the practices of a hodgepodge of state constitutions and state governors' practices. It is highly unlikely that early citizens would have made such a strained correlation; in other words, it would not have been "obvious” to an average citizen to look to state constitutions, let alone to know which two of the twelve constitutions of the ratifying states to analyze. See Heller, 554 U.S. at 576, 128 S.Ct. 2783 ("In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.’ ” (quoting United States v. Sprague, 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931))). It may be reasonable to expect the average citizen to have knowledge of the words in a dictionary, but it is a very different expectation to assume that they would be able to reference state constitutions.

. In addition, the Framers used the singular “Recess” rather than the plural "Recesses” but this distinction reveals little. Given the multiple intersession recesses, and multiple intrasession recesses, during and between the regular sessions of Congress, the singular "Recess” cannot refer literally to a single recess of the Senate (for instance, the single Recess that happens between the last regular session of one Congress and the first regular session of the following Congress). The only other use of "Recess” in the Constitution, which appears in Article I, Section 3, Clause 2, also does not literally refer to a single type of recess. Used in the context of "the Recess of the Legislature of any State”, the Article I "Recess” does not refer to a particular recess since it was used to generically refer collectively to the recesses of every state's legislature.

. The Majority attempts to draw significance from the "of the Senate” language but this phrase could not be plainer. (Majority Op. at 222.) It means exactly what is says and there is no indication, whatsoever, that the Framers used that phrase to indicate that they were relying on the "recess” as it might be defined in Jefferson’s A Manual of Parliamentary Practice.

. To discern the Framers' intent, one reliable source is The Federalist Papers. See Dames & Moore v. Regan, 453 U.S. 654, 659, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); Buckley v. Valeo, 424 U.S. 1, 129, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); see e.g., Heller, 554 U.S. at 595, 598, 128 S.Ct. 2783; United States v. Lopez, 514 U.S. 549, 552, 576-77, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); INS v. Chadha, 462 U.S. 919, 947, 950, 955 n. 21, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). The Federalist Papers that directly comment on the Recess Appointments Clause and the Appointments Clause are useful sources of edification, but also helpful are those Federalist papers that articulate the philosophy and principles guiding the operation of the Constitution as a whole, particularly those concerning the separation of powers and the system of checks and balances. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring).

. In this respect, the advice and consent power of the Senate mimics the veto power of the President since they are both qualified negatives on the other branch’s inherent power. See Myers, 272 U.S. at 120, 47 S.Ct. 21 (calling the advice and consent power “the Senate’s veto on the President’s power of appointment”). Just as the veto power cannot exist without a check, the advice and consent power of the Senate cannot exist without a check.

. Like the veto power, the recess appointment power is a check that the President exerts against the Senate, such that both are shaped by the same principles of governmental design. Further, the Framers’ motivation for creating the President's veto power underlies the other checks it has given the President. Primarily, that motivation was the "propensity of the legislative department to intrude upon the rights, and to absorb the powers, of the other departments [which] has been already more than once suggested.” The Federalist No. 73, at 442 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Hamilton also believed that giving the President such strong checks on Congress would not lead him to abuse his power. He surmised that, "[i]f a magistrate so powerful and so well fortified as a British monarch would have scruples about the exercise of the [veto power], how much greater caution may be reasonably expected in a President of the United States, clothed for the short period of four years with the executive authority of a government wholly and purely republican?” Id. at 444. "[A]s a rule,” Hamilton wrote, "one man of discernment is better fitted to analyze and estimate the peculiar qualities *256 adapted to particular offices, than a body of men of equal or perhaps even of superior discernment” since the legislature is more easily captured by private interests. The Federalist No. 76, at 455-56 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

. In addition, other contemporaneous writings reveal that the reason why the Senate was given the check of providing advice and consent on appointments was that representatives of the smaller states were worried that the larger states would be favored in the appointments process. See Myers, 272 U.S. at 119-20, 47 S.Ct. 21. This purpose is not served any more or less by intrasession recess appointments than intersession recess appointments.

. Of course, reference to advice and consent in this context does not include pro forma sessions, which clearly do not provide an opportunity for the Senate to provide its advice and consent. This point will be elaborated further infra.

. The Majority suggests that the issue of the House exerting influence over recess appointments is remedied by the President's ability to adjourn both houses if they cannot agree on a date of adjournment. U.S. Const, art. II, § 3. This assertion misses the mark. This power of the President does not address the issue of the House essentially creating pro forma sessions to corrupt the intersession-intrasession dynamic. The Majority's remedy is tantamount to saying that the President can initiate an adjournment sine die to create an intersession recess of more than three days whenever he wishes to utilize the Recess Appointments Clause. This is not true. Moreover, this clearly would not be a supplemental use of his recess appointment power.

. The Majority assumes that the Senate could have simply remained available to provide advice and consent by not agreeing to not conduct business during the pro forma sessions or ' 'altering] its procedures to allow messages to be received during such sessions.” (Majority Op. at 243.) First, it is a stretch to suggest that the receipt of messages from the President equates to providing advice and consent. In that respect, the Senate could remain available to provide advice and consent even during intersession recesses by leaving an agent of the Senate to receive messages. Second, the Majority identifies the danger of its own definition of “Recess”: The Senate’s procedures are too easily manipulated.

. For the exact lengths of the pro forma sessions, see 157 Cong. Rec. S8787 (daily ed. Dec. 20, 2011), 157 Cong. Rec. S8789-90 (daily ed. Dec. 23, 2011), 157 Cong. Rec. S8791 (daily ed. Dec. 27, 2011), 157 Cong. Rec. S8793 (daily ed. Dec. 30, 2011), 158 Cong. Rec. SI (daily ed. Jan. 3, 2012), 158 Cong. Rec. S3 (daily ed. Jan. 6, 2012), 158 Cong. Rec. S5 (daily ed. Jan. 10, 2012), 158 Cong. Rec. S7 (daily ed. Jan. 13, 2012), 158 Cong. Rec. S9 (daily ed. Jan. 17, 2012), 158 Cong. Rec. Sll (daily ed. Jan. 20, 2012).

. The other purpose of the Recess Appointments Clause, allowing the Senate to recess without leaving offices vacant, is also diminished by the Majority's definition of "Recess”. Under the Majority’s limited reading, the Senate might feel obliged not to take intrasession recesses when nominations are pending, and not feel at liberty to break, as Hamilton and the Framers desired, lest it cause a vacancy to remain open for the duration of its recess. This would have been traumatic during the era of the Framers: Imagine Senators packed and ready for their long journeys to their home states, only to find out that a cabinet secretary has suddenly resigned office. Rather than leaving the office of a secretary vacant for six to nine months, the Senators might very well feel compelled to remain in the Capitol to provide advice and consent for the new appointment, a process which could take weeks or months. Surely, this is not what the Framers envisioned, nor intended. This would also put undue pressure on the Senate to rush in making its appointment decisions when the Framers clearly intended that officers be appointed with careful deliberation.
Even with a less extreme example, we can imagine the same imposition on the Senate. As mentioned, it is no secret that the advice and consent process is a lengthy and strenuous process. See Noel Canning, 705 F.3d at 508 (calling the advice and consent process “cumbersome”); United States v. Allocco, 305 F.2d 704, 710 (2d Cir.1962) (noting that the appointments process is onerous because of the "difficult task of securing a competent replacement”).

. Moreover, the early dearth of intrasession recess appointments does not provide convincing proof of their unconstitutionality. The President does not lose his constitutional powers because he does not use them. See Freytag, 501 U.S. at 880, 111 S.Ct. 2631 (affirming that the President cannot “waive” his executive powers which provide the structural protections of the Constitution); New York v. United. States, 505 U.S. 144, 182, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (determining that the branches of government cannot cede their constitutional powers even if they voluntarily consent to do so and have done so for a substantial period of time). Constitutional powers do not become unconstitutional simply because they go unused.

. The Congressional Directory only lists recesses of “three or more days, excluding Sundays,” so it is possible that the Senate took brief intrasession recesses early on. Congressional Directory for the 112th Congress 538 n. 2 (2011). If so, then the dearth of early intrasession recess appointments would serve to confirm that intrasession recess appointments should not include intrasession recesses of less than three days.

. There is only an unexplained lack of intra-session recess appointments for the eighty years between 1867 and 1947. One possible reason for the near-absence of intrasession recess appointments during that period may be that intersession recesses were still rather lengthy, often spanning several months, which gave the President ample time to make recess appointments during intersession recesses, compared to the relatively short duration of early intrasession recesses. Another possible explanation is that the passage of the Twentieth Amendment in 1933 forever changed the practices of Congress, especially the timing and length of their sessions and recesses. Louis Fisher, Cong. Research Serv., The Pocket Veto: Its Current Status 2-3 (Mar. 30, 2001). Before that amendment, there was usually a long first session (often over 200 days) and a shorter second session (lasting between 80 and 90 days). Id. at 2. As a result, prior to 1934, "a new Congress typically would not convene for regular business until 13 months after being elected” but, since passage of the amendment, "the time from the election to the beginning of Congress's term as well as when it convened was reduced to two months.” Congressional Directory for the 112th Congress 522 (2011). In addition, as the Congressional Directory notes, prior to the Twentieth Amendment, “special sessions of the Senate were convened, principally for confirming Cabinet and other executive nominations,” which could *266 have made intrasession recess appointments less important. Id.

. A close inspection of the Congressional Directory reveals that there have been approximately thirteen one-day intersession recesses — while not frequent, they are not unprecedented and are certainly not an abstract or hypothetical possibility. See Congressional Directory for the 112th Congress 522 (2011). (This number excludes one-day intersession recesses between a regular session of Congress and a special session of Congress.) The last two one-day intersession recesses occurred on January 3, 2012, during the series of pro forma sessions, and January 3, 2013.

. The Senate Manual also adopts a broader understanding of "the Recess” that is conditioned only on the length of a recess, rather than whether it occurs intrasession or intersession. According to the Senate Manual, motions to reconsider confirmation votes on nominees become moot after a thirty-day break, be it an adjournment or recess. Senate Manual, S. Doc. No. 112-1, at 58 (2012) ("Standing Rules of the Senate”).

. The Majority attempts to displace the absurdity of its holding by showing that my standard also yields absurd results, but the Majority misses my point. My point is only to show that it is absurd to suggest that a one-day intersession recess is somehow different than a long intrasession recess. Thus, the Majority’s holding that the President could have made a recess appointment on Januaiy 3, but not on Januaiy 4 or January 22, means that the one-day intersession recess on January 3 was somehow intrinsically different than January 4 or. January 22. I contend that January 3 is only different because it technically has a different definition than January 4 or January 22 — functionally, all three of those days were the same. Further, there is nothing absurd about treating January 23 differently than January 22. There were no Senators who owed attendance in the Senate chamber on January 22 but, presumably, 100 Senators owed their attendance on January 23.